# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

General Mills Operations, LLC,

                        Plaintiff,

                                              Civ. No. 10-15 (RHK/JJG)
                                              **MEMORANDUM OPINION
                                              AND ORDER**

v.

Five Star Custom Foods, Ltd.,

                        Defendant.

Rolf E. Gilbertson, Christopher R. Paar, Kaisa M. Adams, Zelle Hofmann Voelbel &
Mason LLP, Minneapolis, Minnesota, for Plaintiff.

Michael D. Barrett, Meaghan C. Bryan, Cousineau McGuire Chartered, Minneapolis,
Minnesota, for Defendant.

## INTRODUCTION

Plaintiff General Mills Operations, LLC, f/k/a General Mills Operations, Inc.

("General Mills") purchased meatballs from Defendant Five Star Custom Foods, Ltd.

("Five Star") for use in its Progresso line of soups.  Some of the meat used in these

meatballs was later recalled, and General Mills had to recover and destroy soup

containing the product.  It now asserts that Five Star breached its contract, breached

several express and implied warranties, and was negligent by supplying the recalled

meatballs.  Both General Mills and Five Star have moved for summary judgment.[1]  For

the reasons set forth below, the Court will grant each Motion in part and deny each in

part.

## BACKGROUND

Except where otherwise indicated, the material facts are undisputed.  Both General

Mills and Five Star are companies in the food-products industry.  They have had a

business relationship since 2001, and General Mills continues to be a customer of Five

Star.  (Paar Aff. Ex. 1 (Phillips Dep.) at 10.)

Five Star is a custom food products manufacturer.  As such, it is subject to federal

regulation—specifically, its meat-based products are regulated by the United States

Department of Agriculture ("USDA"), while non-meat products are regulated by the

Food and Drug Administration ("FDA").  (Id. at 11-12.)  Five Star supplies General Mills

with various custom manufactured meat-based products, including the "Big Meatballs

Cooked Italian" used in General Mills' Progresso Italian-Style Wedding Soup.

In the fall of 2007, General Mills ordered two shipments of meatballs from Five

Star, to be delivered by September 28 and October 5.  As was its usual practice, General

Mills sent purchase orders to Five Star via an automated fax system.  The face of its

purchase order form states: "This purchase order contract, along with General Mills'

---

[1] Although not originally styled as cross-Motions, both of the instant Motions were noticed for a hearing on the same date and address substantially the same issues.  Accordingly, the Court determined it would treat them as cross-Motions.  (See Apr. 20, 2011 Order (Doc. No. 90).)

standard Purchase Order Terms and Conditions dated [1/29/04][2] shall govern all terms and conditions of sale. . . . Shipment of the goods against this order constitutes acceptance of terms and conditions dated [1/29/04] – otherwise do not ship." (Paar Aff. Ex. 6; Bryan Aff. Exs. C, D.) According to General Mills, the Purchase Order Terms and Conditions ("Terms and Conditions") were set forth on the back of every purchase order, including the meatball orders faxed to Five Star. (Tran Aff. ¶¶ 4-5; Paar Aff. Ex. 7 (Tran Dep.) at 18-23.) General Mills also claims that it mailed a copy of the 2004 version of its Terms and Conditions to Five Star's Customer Service Manager on February 4, 2004. (Tran Aff. ¶ 10.) For its part, however, Five Star denies receiving the Terms and Conditions.

General Mills asserts that Five Star breached its contract and breached express warranties based on the following relevant provisions in the Terms and Conditions:

> 5. GOODS: The Goods *shall conform in all respects to the description on the face of this Order, and/or [General Mills'] then current specifications furnished to [Five Star].* The Goods . . . shall be new, of first class commercial type . . . unless otherwise specified on the face of this Order. Workmanship and *materials shall be of the best quality and free from*

---

[2] The reprints of the purchase order in the current record actually reference Terms and Conditions dated 11/24/09 (Paar Aff. Ex. 6; Bryan Aff. Ex. C) and 11/15/07 (Bryan Aff. Ex. D). According to General Mills, there have been three versions of these Terms and Conditions, dated January 29, 2004, November 15, 2007, and November 24, 2009. (Tran Aff. ¶ 8.) It explains that the discrepancy in the dates on the purchase orders exists because its system automatically inserts the date of the applicable Terms and Conditions based on the date the purchase order is printed—or reprinted. (Id. ¶¶ 6-8.) Neither party has been able to locate the original faxed purchase orders at issue, so they have submitted reprints to the Court, which refer to different versions of the Terms and Conditions depending upon when they were printed. General Mills asserts, however, that the applicable Terms and Conditions were the 2004 version, since that was the effective version at the time of the September and October 2007 meatball orders in question. (Paar Aff. Ex. 7 (Tran Dep.) at 43, 59-60.) For purposes of the instant Motions, Five Star agrees to assume that the 2004 Terms and Conditions were in force (see Five Star Mem. in Supp. at 7; Five Star Mem. in Opp'n at 3 n.1), and the Court will do likewise.

*defects that might render the Goods unsuitable or inefficient for the purpose for which it is to be used.* [Five Star] warrants and guarantees its Goods for the period of time normally specified for the type of Goods involved. . . . *This warranty is in addition to and not in lieu of, any other warranties or guarantees made by [Five Star] or created or implied as a matter of law.* The above warranties, as well as all other warranties contained herein, including, without limitation, the warranties in paragraphs 6, 8, 9, 10, 12, 18, 20, 21, 25, and 26 shall collectively be defined herein as "Warranties."

\* \* \*

25. COMPLIANCE WITH LAW: [Five Star]'s performance under this Order shall be in *compliance with all applicable federal, state, and local laws, ordinances, regulations, rules and statutes* ("Laws").

\* \* \*

27. RECALL: [General Mills] shall have the sole right, exercisable in its discretion, to initiate and direct the content and scope of a recall, market withdrawal, stock recovery, product correction and/or advisory safety communication (any one or more referred to as "Recall Action") regarding the Goods. . . . Any and all action to be taken in connection with a Recall Action shall be in accordance with FDA policies and other Laws. *[Five Star] shall bear the costs associated with any Recall Action which results from* [Five Star]'s negligence or willful misconduct or *that the Goods do not comply with [Five Star]'s Warranties under this Order.*

(Paar Aff. Ex. 8; Bryan Aff. Ex. E (emphases added).)

Additionally, the purchase order states on its face that "[t]he goods must conform to all current General Mills' specifications as furnished to Seller." (Paar Aff. Ex. 6; Bryan Aff. Exs. C, D.) General Mills mailed a copy of the ingredient specifications ("Specifications") for its "Meatballs Italian Cooked" to Five Star on January 18, 2006. (Paar Aff. Ex. 9; id. Ex. 1 (Phillips Dep.) at 109-12.) Five Star does not dispute receiving these Specifications, and it acknowledges that they applied to the meatballs at issue here. (Phillips Dep. at 109-12.) The Specifications provide:

4

This ingredient shall be *of food grade in all respects*, including labeling, *in compliance with the Meat Inspection Act* of 1906 as amended.

The Beef or Beef By-Product in this ingredient must be sourced from countries or regions where UDSA recognized BSE[3] controls are in place in accordance with the recommendations of the World Animal Health Organization.

*Stunning, slaughter, and processing practices must meet or exceed the requirements established by the USDA* and the World Animal Health Organization for safe trade in animal products.

(Paar Aff. Ex. 9, at 3 (emphases added).)

Five Star obtains the ingredients for its products from a variety of suppliers. One of Five Star's beef suppliers was Westland Meat Packing Company ("Westland"). Westland's beef was used in two orders of meatballs supplied to General Mills. In February 2008, the Food Safety Inspection Service ("FSIS")[4] issued a Class II recall of all products containing beef produced by Westland between February 1, 2006, and February 15, 2008. (See Paar Aff. Ex. 3.) The recall was due to Westland's supposed failure to contact FSIS when it identified non-ambulatory disabled, or "downer," cows that became non-ambulatory after passing ante-mortem inspections but before slaughter. In such situations, regulations at the time required the producer to notify FSIS and call a public-health veterinarian to conduct an examination. Westland's alleged failure to consistently do this was deemed noncompliant, and the recall followed. There is no

---

[3] BSE, which stands for "bovine spongiform encephalopathy," is the scientific name for degenerative neurological disease in cattle that is more commonly known as "mad cow disease." See Center for Disease Control, http://www.cdc.gov/ncidod/dvrd/bse/ (last visited May 5, 2011).

[4] FSIS is the public-health agency within the USDA responsible for ensuring the safety of the commercial meat supply within the United States. See Food Safety and Inspection Service Home, http://www.fsis.usda.gov/ (last visited May 5, 2011).

evidence, however, that any of the Westland beef supplied to Five Star or incorporated into General Mills' meatballs came from downer cattle.

When Five Star learned of the recall, it traced the Westland beef that it had incorporated into its products and notified the customers who had purchased those products. On February 18, 2008, Five Star initially notified General Mills of the recall and identified two purchase orders of meatballs, totaling 32,460 pounds, which contained Westland beef. (Id. Ex. 2.) It also informed General Mills that 25.26 % per batch of those meatballs was Westland meat. (Id.) General Mills also received a follow-up memorandum about the recall from Five Star's President, Jeff Bledsoe, stating that "FSIS officials may contact you to confirm that you have received notification and are cooperating in this action." (Id. Ex. 3.) The memorandum went on to provide:

> As part of this action, the options stated below for final disposal of retrieved product, should be undertaken . . .
> - Product is to be incinerated or
> - Product is to be disposed at a lined landfill or
> - Product is to be disposed for inedible rendering, not intended for pet food.

(Id.) General Mills was thus required to identify and destroy all soup containing the recalled meatballs in its inventory, as well as soup that it had already sold to grocery stores and other customers.[5] The recall cost General Mills more than one million dollars.

General Mills commenced this action in January 2010, asserting claims for breach of contract, breach of express warranties, breach of the implied warranty of

---

[5] The recall did not extend to the consumer level; thus, General Mills did not have to identify and recover soup that had already been purchased by end consumers.

merchantability, breach of the implied warranty of fitness for a particular purpose, and negligence.  Nearly a year later, Five Star (with leave of the Court) filed a Third-Party Complaint asserting claims against Cattleman's Choice, Inc. d/b/a Westland.  (See Doc. No. 34.)[6]  Meanwhile, both General Mills and Five Star have moved for summary judgment on General Mills' claims.[7]

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The moving party bears the burden of showing that the material facts in the case are undisputed.  Id. at 322; Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007).  The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial.  Anderson v. Liberty

---

[6] A Motion to Dismiss and Strike that Third-Party Complaint with respect to Third-Party Defendant Cattleman's Choice, Inc. was recently argued before United States Magistrate Judge Jeanne J. Graham, and a Report and Recommendation has been issued.  (See Doc. No. 92.) However, because the two instant Motions involve only General Mills' claims against Five Star, the presence (or absence) of additional parties is immaterial to their resolution.

[7] General Mills seeks summary judgment only on Counts II-V (the breach of contract and warranty claims), while Five Star seeks summary judgment on all five counts, including the negligence claim in Count I.

Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528 F.3d 1074, 1078-79 (8th Cir. 2008).

Where, as here, the Court confronts cross-motions for summary judgment, this approach is only slightly modified.  When considering the defendant's motion, the Court views the record in the light most favorable to the plaintiff, and when considering the plaintiff's motion, the Court views the record in the light most favorable to the defendant. Int'l Bhd. of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc., 293 F.3d 402, 404 (7th Cir. 2002).  "Either way, summary judgment is proper if the record demonstrates that there is no genuine issue as to any material fact."  Id.

## ANALYSIS

### I.    Negligence claim

Five Star argues that General Mills' negligence claim (Count I) is precluded as a matter of law by the economic-loss doctrine.  (See Five Star Mem. in Supp. at 12.) General Mills has agreed to abandon the claim;[8] accordingly, Count I will be dismissed, and the Court need not analyze whether the economic-loss doctrine applies.  (See General Mills Mem. in Opp'n, at 3 n.2)

### II.   Warranty claims

Five Star argues the mere fact its meatballs were recalled does not, as a matter of

---

[8] It was not entirely clear from General Mills' Memorandum whether it really intended to abandon the claim.  It stated: "[a]s discussed more fully below, General Mills will voluntarily dismiss its negligence claim against Five Star," yet dismissal of the claim was discussed nowhere else in the Memorandum, and General Mills *did* argue that the economic-loss doctrine should not apply.  (See Gen. Mills Mem. in Opp'n at 3, n.2, 26-27.)  However, at the hearing on the instant Motions, General Mills clarified its intent to abandon the claim.

law, mean they were unfit or defective in any way since there is no evidence they contained potentially-contaminated meat from downer cattle.  In support of its position, Five Star relies heavily on products-liability cases.  The Eighth Circuit has ruled that "purchasers of an allegedly defective product have no legally recognizable claim where the alleged defect has not manifested itself in the product they own."  Briehl v. Gen. Motors Corp., 172 F.3d 623, 628 (8th Cir. 1999) (citations omitted).  This rule is "well established."  O'Neil v. Simplicity, Inc., 574 F.3d 501, 503 (8th Cir. 2009).  Five Star urges the Court to adopt similar reasoning here to find that the recall does not mean the meatballs were defective and thus it did not breach any express or implied warranty.

General Mills responds that the warranties at issue—including that the meatballs were free from defects, of food grade, in compliance with regulations, and met the Specifications—were breached because the meatballs were not in compliance due to the recall.  According to the Eighth Circuit, however, "[e]vidence of a defect is an indispensable element of any express or implied warranty claim."  Coop. Power Ass'n v. Westinghouse Elec. Corp., 60 F.3d 1335, 1344 (8th Cir. 1995); accord, e.g., O'Neil, 574 F.3d at 503-04 (affirming dismissal of warranty claims where the alleged defect had not manifested itself in plaintiffs' product).  This Court previously followed Briehl in a case involving recalled cribs.  See O'Neil v. Simplicity, Inc., 553 F. Supp. 2d 1110, 1115-16 (D. Minn. 2008) (Kyle, J.), aff'd, 574 F.3d 501.  Although there had been reports of children being injured, and even dying, as a result of a failure in the crib's drop-side feature, the crib purchased by the O'Neils had not exhibited this problem.  See id.  The Court dismissed the O'Neils' warranty claims, concluding that the fact the crib had been

recalled "does not *ipso facto* mean that the crib has a manifest defect sufficient to permit their claims to proceed." Id. at 1116.  In the Court's view, the same is true here.

There is no dispute that a recall occurred.  However, General Mills has presented no evidence that the recalled meat was contaminated or defective in any way.  At most, it can only claim that Westland's meat *may have* included meat from downer cattle.  There is no evidence that such meat was sold to Five Star and, even if it had been, there is no evidence it was used in the meatballs Five Star supplied to General Mills.  In short, there is no evidence of an actual manifestation of any defect in the meatball product to support a claim for breach of an express or implied warranty.  Five Star is therefore entitled to summary judgment on the warranty claims.

## III.    Breach of contract claim

Although the parties largely conflate the warranty claims and the breach-of-contract claim, the contract claim differs in an important way.  Unlike warranty claims, evidence of a defect is not an essential element of a breach-of-contract claim.  To establish breach of contract, General Mills must show that (1) a contract was formed, (2) it performed any required conditions precedent,[9] (3) Five Star materially breached the contract, and (4) it suffered damages as a result.  E.g., Parkhill v. Minn. Mut. Life Ins. Co., 174 F. Supp. 2d 951, 961 (D. Minn. 2000) (Doty, J.) (citations omitted).[10]

---

[9] Neither side has identified any conditions precedent required by the agreement at issue.  Thus, the Court need not address that element here.

[10] There is no question here that Minnesota law governs this case, and neither party raises any choice-of-law argument.

In this case, Five Star admits that it had a duty to supply General Mills with meatballs that complied with USDA regulations.  (Phillips Dep. at 108-09.)  It also acknowledges that General Mills had no choice but to destroy its soup containing the meatballs due to the recall.  (Id. at 115-16 ("Q. . . . General Mills believes that it had no choice but to destroy the product . . . that incorporated Five Star meatballs because of the USDA recall.  Does [Five Star] disagree with that position?  A.  No.").)  Yet, as with the warranty claims, it argues that the mere fact of the recall cannot amount to a breach of contract.  Conversely, General Mills argues that the recall does evince a breach, even without any proof of an actual defect, since various contract terms expressly required the meatballs to comply with USDA regulations and the meatballs at issue did not.

A contract claim like the one here is distinguishable from O'Neil, Briehl, and other products-liability cases on which Five Star relies.  The difference is explored in Coghlan v. Wellcraft Marine Corp., 240 F.3d 449 (5th Cir. 2001), a case involving plaintiffs who purchased a boat that the defendant-manufacturer said was made entirely of fiberglass.  When they discovered the boat was actually made of a less durable wood-fiberglass hybrid, they sued the manufacturer on claims including violations of consumer-protection laws, deceptive trade practices, misrepresentation, and breach of contract.  Id. at 451.  Reversing the district court's dismissal of these claims, the Fifth Circuit stated:

> The key distinction between this case and a "no-injury" product[s] liability suit is that the Coghlans' claims are rooted in basic contract law rather than the law of product[s] liability:  the Coghlans assert they were promised one thing but given a different, less valuable thing.  The core allegation in a no-injury product[s] liability class action is essentially the same as in a traditional products liability case:   the defendant produced or sold a defective product and/or failed to warn of the product's dangers.  *The*

11

> *wrongful act in a no-injury products suit is thus the placing of a dangerous/defective product in the stream of commerce. In contrast, the wrongful act alleged by the Coghlans is Wellcraft's failure to uphold its end of their bargain to deliver what was promised.* The striking feature of a typical no-injury class is that the plaintiffs have either not yet experienced a malfunction because of the alleged defect or have experienced a malfunction but not been harmed by it. Therefore, the plaintiffs in a no-injury products liability case have not suffered any physical harm or out-of-pocket economic loss. Here, *the damages sought by the Coghlans are not rooted in the alleged defect of the product as such, but in the fact that they did not receive the benefit of their bargain.*

Id. at 455 n.4 (emphases added). Just as in Coghlan, General Mills' contract claim does not seek damages rooted in any alleged defect in the product. Instead, the claim is based solely on Five Star's failure to do what it agreed to do—supply meatballs that complied with all of the Terms and Conditions and Specifications.[11]

Notably, the alleged contract in this case did not simply require Five Star's meatballs to be of food grade and fit for human consumption. Rather, the Terms and Conditions expressly provided that the product "shall conform in all respects to the . . . current Specifications." (Paar Aff. Ex. 8, ¶ 25; Bryan Aff. Ex. E, ¶ 25.) In turn, the Specifications required the ingredients in the meatballs to comply with the Meat Inspection Act and to "meet or exceed" all USDA stunning, slaughter, and processing requirements. (Paar Aff. Ex. 9, at 3.) While the fact of the recall may not mean there

---

[11] Courts have rejected attempts by plaintiffs to recast products-liability claims in the language of contract law in order to recover "benefit-of-the-bargain" damages in the absence of actual injury. E.g. Rivera v. Wyeth-Ayerst Labs., 283 F.3d 315, 320 (5th Cir. 2002) (noting that Coghlan distinguishes valid, contract lawsuits from no-injury products liability actions, but declining to allow recovery of contract damages where plaintiffs alleged no contract claim and had no contract); O'Neil, 553 F. Supp. 2d 1117-18 (citing Briehl, 172 F.3d at 629). However, General Mills has not attempted to recast a products-liability case in contract language here. Instead, this case is a contract dispute; if anything, Five Star is attempting to recast it in products-liability language in order to shield its conduct with Eighth Circuit precedent requiring an actual defect.

was anything unsafe about the meatballs, it does mean Five Star failed to fully comply with these regulations as the Specifications required. The recall was initiated because it came to light that some Westland cattle became non-ambulatory prior to slaughter, and Westland failed to call the public-health veterinarian to inspect them as regulations required at the time.[12] See 9 C.F.R. § 309.3(e); 76 Fed. Reg. 6572-73 (Feb. 7, 2011) (describing the progression of regulations on slaughtering non-ambulatory disabled livestock). In fact, Five Star has conceded that its own understanding of the recall is that the meatball product "had been recalled by the USDA *because it didn't meet the USDA's regulations*." (Phillips Dep. at 115-16 (emphasis added).) Five Star breached the agreement by failing to supply meatballs that met or exceeded all USDA stunning, slaughter, and processing regulations.

---

[12] Five Star argues that the Recall Press Release General Mills offers as evidence of the reason for the recall is hearsay and must not be considered. (See Five Star Mem. in Opp'n at 6.) There is, however, sufficient other evidence in the record to make a fact determination about the reason for the recall without considering the Press Release. Specifically, Five Star has proffered statements by the Undersecretary of Food Safety at a technical debriefing that explain the reason for the recall as follows:

> When it came time for [some cattle] to enter the slaughter facility, they became, some of them became nonambulatory. And at that point in time, the public health veterinarian is to be immediately notified and come out and do an inspection of that animal and determine whether it can go into the slaughter facility . . . , or whether it should be condemned. . . . *[Westland] did not call the public health veterinarian to do that procedure, and therefore they were <u>noncompliant</u>* . . .
> * * *
> We do not feel this product presents a health risk of any significance, *but the product was <u>produced in noncompliance with our regulations</u> and therefore we do have to take this action.*

(Second Bryan Aff. Ex. D (emphases added).)

This does not end the inquiry, however, because Five Star also argues that the contract with General Mills is unenforceable for a variety of reasons. First, it argues the Terms and Conditions did not apply to the transactions at issue because it never received them. (Five Star Mem. in Supp. at 14-15.) General Mills contests this, offering testimony that (a) it mailed a copy of the applicable Terms and Conditions to Five Star on February 4, 2004, and (b) its auto-fax system transmitted two-sided purchase orders, and the Terms and Conditions were on the backside of the two meatball orders at issue. Five Star fails to rebut this evidence, instead asking the Court to take notice that "[a]s a matter of common knowledge, fax machines do not generally transmit double-sided documents." (Five Star Mem. in Supp. at 14.) Regardless, resolution of this dispute is immaterial because it is undisputed that the front side of the purchase orders explicitly stated that "General Mills' standard Purchase Order Terms and Conditions . . . shall govern all terms and conditions of sale." (E.g., Paar Aff. Ex. 6.) Thus, the purchase order incorporated the Terms and Conditions by reference, and Five Star was at the very least on notice of their existence and responsible to obtain and become familiar with them if they were not included with the purchase order. See, e.g., Freeman v. Skogen, No. C5-93-348, 1993 WL 318927, at *1 (Minn. Ct. App. Aug. 24, 1993) ("The trial court properly concluded that the reference in the purchase agreement to the rules 'adopted by the American Arbitration Association and the Minnesota Association of Realtors' was specific enough for any interested party to obtain and read those rules. The rules were incorporated by reference into the purchase agreement.") (citation omitted).

14

Five Star further contends that the Terms and Conditions are unenforceable because they were unconscionable, inconspicuous, illegible, and hidden in boilerplate. (Five Star Mem. in Supp. at 16-21.)  The Court addresses each in turn.

Five Star first argues that the reference to the Terms and Conditions on the front of the purchase order is inconspicuous and illegible due to its location and small print.  It points to the fact this reference is in the lower left corner of the purchase order and in "extremely small print" that is almost "entirely illegible."  While the print is not large, it is only slightly smaller than other information on the purchase order, such as the product, price, and delivery date, and the Court is able to read it without undue strain. Furthermore, the front of the purchase order contains significant blank space, making the type that is present easy to see.  In the Court's view, the reference to the Terms and Conditions on the purchase order is sufficiently conspicuous.

Relatedly, Five Star argues the Terms and Conditions themselves are not sufficiently clear to enforce because they are boilerplate, in small print, and located on the back of the purchase order.  Despite Five Star's attempts to argue otherwise, the Terms and Conditions (at least in the reprints both parties have submitted) are legible although the font is not large, and all are a uniform size.  Where (as here) the parties are both sophisticated business entities with equal bargaining power who entered this agreement freely, the fact print is small and boilerplate is not enough to render the contract unenforceable.  See, e.g., Dave's Cabinets, Inc. v. Komo Mach., Inc., Civ. No. 05-854, 2006 WL 1877075, at *5 (D. Minn. July 6, 2006) (Davis, J.) (enforcing a provision that was "in fine print" but "not unreadable" where, inter alia, the parties were

15

sophisticated, the provision was in plain and unambiguous language, and it was the same size as every other term and condition on the page); Kline v. Kawai Am. Corp., 498 F. Supp. 868, 872-73 (D. Minn. 1980) (MacLaughlin, J.) (enforcing forum-selection clause despite the fact it was boilerplate and not specifically negotiated where the parties were sophisticated, had business experience, and the agreement was readable and just over two pages long).

Similarly, the fact the terms were on the back of the purchase order does not necessarily render them unenforceable where they did not materially alter the parties' agreement. E.g., CFMOTO Powersports, Inc. v. NNR Global Logistics USA, Inc., Civ. No. 09-2202, 2009 WL 4730330, at *4-5 (D. Minn. Dec. 4, 2009) (Tunheim, J.) (enforcing terms and conditions found on the reverse side of every invoice sent between the parties where they did not materially alter the agreement). A purchase order is a written confirmation of an agreement between parties, and Minn. Stat. § 336.2-207 provides that a non-negotiated term contained in such a written confirmation is part of a contract for the sale of goods between merchants where it does not materially alter the agreement. See TRWL Fin. Establishment v. Select Int'l, Inc., 527 N.W.2d 573, 578-79 (Minn. Ct. App. 1995) (citing Minn. Stat. § 336.2-207(2)). In determining whether a term constitutes a material alteration, courts consider whether it is an undue surprise to the party. See Marvin Lumber & Cedar Co. v. PPG Indus., Inc., 401 F.3d 901, 911 (8th Cir. 2005) (citations omitted). Here, since the same Terms and Conditions had governed the parties' business dealings since 2004, Five Star cannot claim unfair surprise with respect to this particular transaction. In light of the parties' sophistication and ongoing

16

business relationship, the Court finds the Terms and Conditions enforceable despite their location on the back of the purchase order.

Five Star next argues it would be unfair to hold it liable for the acts of Westland when it had no reason to know the meat producer had not been fully complying with regulations.  Yet it would be even more unfair to make General Mills—the party even further removed from the problem's source—bear the costs associated with the recall.  In terms of "fairness," shifting the costs onto Five Star, who may in turn be able to shift them to Westland (as it is already attempting to do via its Third-Party Complaint), is the more just result, in addition to being what the contract requires.

Although Five Star does not dispute receiving the Specifications or otherwise argue they were not part of the contract, it maintains that the provision requiring ingredients to meet or exceed USDA stunning, slaughter and processing regulations is unenforceable.  (Five Star Mem. in Opp'n at 22-23.)  Five Star argues it is unreasonable to interpret the provision as requiring Five Star to guarantee that the slaughterhouses where it gets its beef comply with all USDA regulations because doing so would render superfluous another provision in the Specifications that requires it to source beef only from countries where USDA-recognized BSE controls are in place.[13]  Instead, it urges the Court to interpret the stunning, slaughter, and processing provision as not applying to Five Star as it does not operate its own slaughterhouse.  The Court rejects this interpretation and does not find the provisions superfluous.  As evidenced here, it is

---

[13] At the hearing on these Motions, Five Star went so far as to claim that it does not worry about the regulations being met because it only sources meat from USDA-regulated plants.

possible for meat to come from a USDA-regulated slaughterhouse yet still be out of

compliance with regulations.  Indeed, that is precisely what happened in the instant

case—Five Star obtained beef from Westland, a U.S. company subject to USDA

regulations, yet the meat was later recalled because Westland failed to comply with

certain regulations.  In the Court's view, it is not unreasonable to apply the provision at

issue to Five Star.  It is enforceable, and Five Star failed to satisfy it.

Finally, the Court addresses the issue of attorney fees.  General Mills asserts that it

is entitled to recover attorney fees for Five Star's breach pursuant to the express terms of

the contract.  Specifically, it relies on paragraph 10 of the Terms and Conditions, which

provides:

> 10.  AUDIT/INSPECTION:
>
> * * *
>
> (c) [Five Star] shall promptly pay or reimburse [General Mills] for all costs
> and damages (including lost profits) incurred by [General Mills], including,
> without limitation, costs for packaging, handling, transportation, recall,
> destruction, production, and other administrative costs including legal fees,
> *which arise or result from the delivery of Goods by [Five Star] that is not
> in accordance with the Warranties or any other term in this Order*.

(Paar Aff. Ex. 8; Bryan Aff. Ex. E (emphasis added).)  Five Star does not dispute that the

contract provides for attorney fees; it merely argues that General Mills has no right to

such fees because it cannot show that there was any breach.  (See Five Star Mem. in

Opp'n at 32.)  Here, because the Court finds that Five Star breached the contract by

failing to provide meatballs that fully complied with the Specifications, as the Terms and

Conditions and the purchase order required them to, the contract also requires it to

reimburse General Mills for reasonable attorney's fees incurred.  See, e.g., Video Update, Inc. v. Videoland, Inc., 182 F.3d 659, 665 (8th Cir. 1999) (upholding award of attorney's fees where purchase agreement expressly provided for fee recovery in case of a breach and the agreement was found to have been breached).

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED**:

(1)    Count I of the Amended Complaint (Doc. No. 47) is **DISMISSED WITHOUT PREJUDICE**;

(2)    General Mills' Motion for Summary Judgment (Doc. No. 73) is **GRANTED IN PART** and **DENIED IN PART**, and Five Star's Motion for Summary Judgment (Doc. No. 79) is **GRANTED IN PART** and **DENIED IN PART** as follows:

(a)    Summary judgment is **GRANTED** in favor of General Mills and against Five Star on Count II of the Amended Complaint (Doc. No. 47); and

(b)    Summary judgment is **GRANTED** in favor of Five Star and against General Mills on Counts III, IV, and V of the Amended Complaint (Doc. No. 47), and those counts are **DISMISSED WITH PREJUDICE**; and

(3)    General Mills is entitled to recover reasonable attorney's fees.


Dated: May 20, 2011                          s/Richard H. Kyle
                                             RICHARD H. KYLE
                                             United States District Judge